IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT
OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| HARLEY M. BRADY, | |
| Plaintiff, | |
| v. | Case No. 1:14-cv-5545 |
| LASALLE COUNTY MUNICPALITY, LASALLE COUNTY JAIL, LASALLE COUNTY SHERIFF THOMAS J. TEMPLETON, in his official capacity, CORRECTIONAL HEALTHCARE COMPANIES, INC., JASON EDGCOMB, ADEYEMI FATOKI M.D., and DENISE KASZYNSKI, in their individual capacities, | Judge Charles R. Norgle |
| Defendants. | |

**OPINION AND ORDER**

Plaintiff Harley M. Brady ("Plaintiff") filed this 42 U.S.C. § 1983 action against various entities and individuals involved with the administration of the LaSalle County Jail and its medical services. Plaintiff alleges, in essence, that the jail's administrators and medical personnel failed to provide him adequate dental care despite his repeated complaints of severe tooth pain and requests to see a dentist, and that the failure to provide adequate care ultimately led to the decay of several of his teeth, three of which were extracted once he was placed in a different correctional facility with a dentist on staff. Following amendment of Plaintiff's complaint and the voluntary dismissal of certain parties, the remaining defendants are the LaSalle County Municipality and the jail's superintendent during the relevant period, Jason Edgcomb (collectively the "Administrative Defendants") along with Correctional Healthcare Companies, Inc. (CHC), jail nurse Denise Kaszynski, and jail doctor Adeyemi Fatoki (collectively the "Medical Defendants"). The

1

Administrative Defendants and the Medical Defendants have separately moved for summary judgment. For the following reasons, the Court denies summary judgment for both sets of Defendants.

## I. BACKGROUND

The facts are as follows—though many, as noted throughout, are subject to dispute.[1] Plaintiff was incarcerated in LaSalle County Jail from April 24, 2013 through October 21, 2014. Prior to his incarceration, Plaintiff had been experiencing a dental issue—a hole in one of his bottom left teeth—for roughly two-and-a-half months. Plaintiff informed jail staff about that hole during the jail intake process, which is reflected on a medical intake form. Dkt. 116-1, Ex. C. Plaintiff claims (and the Administrative Defendants dispute), that in or around May 2013, Superintendent Edgcomb, while talking with Plaintiff outside his cell, told Plaintiff that the jail had an "unwritten policy" whereby the inmates, if they needed dental work done, would have to arrange to have a family member pay for that dental appointment, with the jail providing only transportation to the appointment. The Administrative Defendants, on the other hand, claim that during this conversation, Edgcomb said that if the medical staff determined that Plaintiff's tooth needed to be pulled, the jail would take care of it, and that any dental care Plaintiff would receive would have to be initiated through the medical staff by setting up an appointment with the jail's medical staff. Plaintiff claims that Edgcomb did not reference the need to go through the medical staff in order to seek dental care and that he believed, based on that conversation with Edgcomb, that if he wanted dental care he would have to have his family set up and pay for a dental appointment. Plaintiff claims he believed his family did not have the means to set up such an appointment.

---

[1] The following undisputed facts were taken from each set of Defendants' LR 56.1 Statement of Material Facts ("Def.'s SOMF") and Plaintiff's responses to those statements of fact.

In any event, during his first two months in jail, Plaintiff attempted to treat the tooth himself using a temporary filling product called DenTek, which he had purchased from another inmate. Plaintiff claims he initiated a formal grievance, in June 2013, about the need to pay for his own dental care and seeking alternative arrangements. He states that the jail lost that grievance, prompting him to file a subsequent grievance about the jail's faulty grievance-related record keeping. Later, on October 7, 2013, Plaintiff filed a grievance requesting DenTek, which was prompted by an apparent mix-up about whether Plaintiff was approved to receive DenTek from the facility (he was). Plaintiff received the DenTek the next day, according to the Administrative Defendants.

On November 8, 2013, Plaintiff filed another grievance, writing that the temporary filling he had given himself had broken free while he was eating peanut butter and crackers and that while preparing to re-fill his bottom left tooth he accidentally knocked out a filling on one of his top teeth. Plaintiff wrote in the grievance that, "This has had me laying in bed rolling around in seve[re] pain for hours." Plaintiff further described the pain as "intense" despite having reapplied the DenTek and then requested "emergency dental attention." See Dkt. 117-1, Ex. E. Plaintiff wrote a follow-up grievance on December 4, 2013 stating that he believed Edgcomb had ignored the substance of his November grievance related to the "intense pain." Edgcomb responded the next day stating that he wanted to help Plaintiff and that Plaintiff would be scheduled with a visit with the jail physician Dr. Fatoki, who had a specialty in internal medicine.

Plaintiff met with Dr. Fatoki on December 11, 2013. At that December 11 appointment, Fatoki reported that there was a cavity in a tooth on the right side of Plaintiff's mouth but did not report any decay or issues on the left side of Plaintiff's mouth, which is the side he had been complaining about. At that point, the Medical Defendants claim that Dr. Fatoki "did authorize

3

plaintiff to have an extraction of the bothersome[2] tooth, which plaintiff refused because he wanted it filled." Medical Defendants' SOMF ¶ 19. Plaintiff disputes that assertion, claiming that Dr. Fatoki never offered extraction as a treatment option. At that appointment, Fatoki also informed Plaintiff that routine dental services were not part of his contract with the jail.

Plaintiff again saw Dr. Fatoki on April 30, 2014—the result of Plaintiff's request to see a dentist—at which point Dr. Fatoki noted that Plaintiff's commissary history included sugary snacks and drinks. Dr. Fatoki additionally noted that there was no inflammation of any tooth or that any tooth needed to be extracted at that time.

Finally, Plaintiff saw Dr. Fatoki again on September 3, 2014 for a toothache, at which point Dr. Fatoki reported that Plaintiff had an infection around tooth #12 and prescribed Plaintiff Amoxicillin (an antibiotic) and Ibuprofen.

Throughout Plaintiff's time at the LaSalle County Jail, in addition to seeing Dr. Fatoki, he saw a nurse, Denise Kaszynski, on several occasions. For example, during a December 2, 2013 meeting, the Medical Defendants claim that the nurse did not note any sign of swelling or infection in Plaintiff's mouth. Plaintiff, on the other hand, points out that the nurse noted that she had looked at Plaintiff's face (rather than inside his mouth) to make that determination and that the medical cart that the nurse traveled with did not have a flashlight, making it difficult to see into Plaintiff's mouth given the jail's lighting.

One additional notable incident took place in the jail on May 2, 2014. An incident report prepared by one of the jail's deputies states that at about 1 a.m., the deputy brought Plaintiff an icepack, DenTek, and oral gel. Dkt. 116-1, Ex. F. The incident report, prepared by the deputy,

---

[2] It is unclear from the Medical Defendants' SOMF whether the "bothersome" tooth is the tooth on the right side that the Doctor apparently identified as problematic or the tooth on the left side that Plaintiff had been treating himself with DenTek.

4

notes that Plaintiff "appeared to be in extreme pain" and that he was crying and his face was red, which is presumably what prompted the encounter. Id.

On October 21, 2014, Plaintiff was transferred to the Illinois Department of Corrections and arrived at Lawrence Correctional Center on November 3, 2014. Plaintiff was examined by a licensed dentist—Dr. Litherland—on November 12, 2014. Dr. Litherland found that teeth numbers 15, 16, and 17 were non-restorable, that tooth 17 was infected, and all three teeth needed to be extracted. Dr. Litherland additionally prescribed Plaintiff antibiotic and pain medications.

## II. DISCUSSION

### A. Standard of Review

"Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Northfield Ins. Co. v. City of Waukegan, 701 F.3d 1124, 1128 (7th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Wells v. Coker, 707 F.3d 756, 760 (7th Cir. 2013) (internal quotation marks and citation omitted). "On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). The Court must view "the record in the light most favorable to the nonmovant and [avoid] the temptation to decide which party's version of the facts is more likely true." Id. Finally, "to survive summary judgment, the nonmoving party must present evidence sufficient to establish a triable issue of fact on all essential elements of its case." Lewis v. CITGO Petroleum Corp., 561 F.3d 698, 702 (7th Cir. 2009).

### B. Plaintiff's Eighth Amendment Claims

Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when their conduct demonstrates "deliberate indifference to serious medical needs of prisoners." Estelle v. Gamble, 429 U.S. 97, 104 (1976). This standard contains both an objective and a subjective element. First, the deprivation by the prisoner must be "objectively, sufficiently serious." Gutierrez v. Peters, 111 F.3d 1364, 1369 (7th Cir. 1997). A "serious" medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Id. The subjective element requires that the officials act with a "sufficiently culpable state of mind." Id.

Although "[n]either medical malpractice nor mere disagreement with a doctor's medical judgment is enough to prove deliberate indifference in violation of the Eighth Amendment[,]" when medical providers opt for the "easier and less efficacious treatment" for an objectively serious medical condition, it can "still amount to deliberate indifference for purposes of the Eighth Amendment." Berry v. Peterman, 604 F.3d 435, 441 (7th Cir. 2010).

Turning first to the objective element,[3] a reasonable jury could find that Plaintiff was suffering from a serious medical condition. The Seventh Circuit, dealing with a similar set of facts in Berry v. Peterman, held that prolonged dental pain can be considered an objectively serious medical condition. 604 F.3d at 442. Here, a jury could look to a number of facts and reasonably find that Plaintiff's ailment was objectively serious. First, Plaintiff's documented complaints of pain—ultimately culminating with a deputy finding him crying in his bed and in extreme pain—span a long timeframe, potentially Plaintiff's entire 18-month stay in the LaSalle County Jail. Further, when Plaintiff was transferred to another jail and seen by an actual dentist, the dentist

---

[3] This analysis applies with equal force to the Medical Defendants and the Administrative Defendants.

determined that three of Plaintiff's teeth needed to be pulled (and that one of those was still infected). These facts alone suggest to the Court that a jury could find that Plaintiff was suffering from a sufficiently serious ailment. Moreover, as a practical matter, the Defendants offer no support for the idea that Plaintiff's request to see a dentist was somehow disingenuous or driven by a desire for a pleasurable experience.

As to the subjective state of mind element, the Court's analysis must fork between the Medical Defendants and the Administrative Defendants—as the parties have argued, properly, that different law and facts apply. As to the Medical Defendants, the Court again draws from Berry— which is directly applicable to this situation. See Berry, 604 F.3d at 442 ("[A] doctor's choice of the 'easier and less efficacious treatment' for an objectively serious medical condition can still amount to deliberate indifference for purposes of the Eighth Amendment."). There, the Seventh Circuit held that although a doctor was attempting to treat an inmate's dental condition using pain medication and other temporary fixes:

> [That doctor's] refusal to refer Berry to a dentist resulted in a substantial and unnecessary delay in the treatment of his decaying tooth. The medical records and Berry's steady complaints of escalating pain indicate that the delay unreasonably prolonged Berry's suffering, making summary judgment inappropriate.

Id. The Court noted that it was troubled by the fact that the physician in Berry would only refer inmates to a dentist when the dental issues escalated to an "emergency" and wrote that the delay in treatment only occurred because Berry had the "misfortune of being transferred to a jail without an on-site dentist." Id. Such is the case here. A jury could reasonably conclude that Plaintiff's suffering was unreasonably prolonged due to the simple misfortune that he was in a facility that did not have an on-site dentist.

The Berry Court likewise stated that summary judgment would not be proper for the nurse who had assisted the doctor yet had unreasonably failed to consult with that doctor about whether

7

a dentist's appointment was necessary. In light of the similarities to this situation, summary judgment would be improper as to Nurse Kaszynski as well.

With respect to the third Medical Defendant, CHC, this entity can be held liable for constitutional violations where its customs or policies were the reasons for a plaintiff's constitutional injury. Daniel v. Cook County, 833 F.3d 728, 734 (7th Cir. 2016). The Court concludes that a reasonable jury could credit the statement by Plaintiff that CHC operated with a policy through which Plaintiff's Constitutional rights were violated—namely that CHC employees would refuse to refer inmates to dental services unless an "emergency" situation developed. Throughout its summary judgment briefing, Medical Defendants repeatedly point to the fact that Plaintiff's dental issues did not rise to the level of being an emergency. Yet the law is clear that "such emergencies are certainly not the only serious dental conditions that demand reasonably prompt professional attention." Berry, 604 F.3d at 442 ("We are troubled by the evidence that Dr. Butler would not refer Berry to a dentist unless and until he presented either a 'dental emergency' or infection. For a physician to wait to treat a patient until an infection occurs seems counterintuitive."). Thus, this "emergency" argument is no cure-all for Medical Defendants.

Moreover CHC argues that it was only *contractually-obligated* to provide dental services in emergency situations. Because it did not contract with the state to provide non-emergency dental services, it argues, it did not step into the shoes of the state for Section 1983 liability in relation to non-emergency dental situations. For this proposition, CHC cites to Rodriguez v. Plymouth Ambulance Serv., 577 F. 3d 816 (7th Cir. 2009). The Court's reading of Rodriguez, however, leads to the opposite conclusion—that CHC, in voluntarily contracting to provide medical services at the LaSalle County jail, opted to step into the shoes of the State and thus should be held to the same standards when considering the deliberate indifference to a serious medical need. Moreover, and without wading too deeply into this supposed contractual limitation, the

Court nonetheless questions Medical Defendants' interpretation of Clause 1.4 of that contract, which does not place a limitation on CHC referring an inmate out to dental services generally (as opposed to actually providing those services itself).[4]

The Court is thus satisfied that a reasonable jury could find that CHC stepped into the role of the state and adopted a policy which violated Plaintiff's Constitutional rights.

Turning now to the Administrative Defendants, while it is clear that Edgcomb took some steps to attempt to help Plaintiff, Plaintiff has put forth sufficient facts from which a jury could reasonably conclude that he was aware of Plaintiff's suffering due to dental pain and failed to take appropriate actions. Moreover, there is a material factual dispute over what Edgcomb actually told Plaintiff with respect to the jail's dental policy, and this dispute precludes summary judgment. The Court likewise holds that this factual dispute precludes summary judgment on the ground of qualified immunity and as to the Administrative Defendants' argument regarding individual liability.

In short, due to substantial disputes on issues of material fact at every turn, each motion for summary judgment is denied. Finally, with respect to Defendants' motion to strike, Defendants have submitted an undeveloped argument with the expectation that the Court will ferret through and identify each alleged inconsistency between Plaintiff's statements. As such, that motion is likewise denied. United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.")

IT IS SO ORDERED.

ENTER: /s/ Charles R. Norgle

CHARLES RONALD NORGLE, Judge
United States District Court

---

[4] The clause reads, in full: "DENTAL - EMERGENCY DENTAL ONLY. CHC shall arrange and bear the cost of emergency dental services only if CHC's CHIEF MEDICAL OFFICER or designee determines that dental care is medically necessary. In the event that the JAIL POPULATION requires any other dental services, the COUNTY shall bear the cost. Costs for offsite dental services shall be included in the CAP AMOUNT listed in Section 1.19.

9

DATE: June 28, 2019